James Larry McGLOTHLIN, Appellant,

v.

The STATE of Texas, Appellee.

No. 459–86.

Court of Criminal Appeals of Texas,
En Banc.

April 6, 1988.

Rehearing Denied May 11, 1988.

Robert C. Roe, Jr., Danny D. Burns, Fort Worth, for appellant.

Jack A. McGaughey, Dist. Atty., Montague, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

DUNCAN, Judge.

Appellant was convicted by a jury of the offense of possession of a controlled substance, to-wit: amphetamine of an aggregate weight, including any adulterants or dilutants of more than 400 grams, under the Texas Controlled Substances Act. TEX.REV.CIV.STAT.ANN. art. 4476–15, § 4.041(d)(2) (Vernon Supp.1988). Punishment was assessed by the jury at 25 years confinement in the Texas Department of Corrections and a fine of $50,000 was levied. On appeal, the Second Court of Appeals affirmed the appellant's conviction. *McGlothlin v. State*, 705 S.W.2d 851 (Tex. App.—Fort Worth 1986, pet. granted).

We granted the appellant's petition for discretionary review to determine whether the court of appeals was correct in concluding that the trial court had not committed

reversible error in failing to grant appellant's motion for new trial wherein he claimed that the evidence of the quantity of amphetamine was over 400 grams was insufficient.[1] The sole issue in this case is the meaning of the terms "adulterants" and "dilutants."

Both the appellant and the State produced expert testimony relative to the content and weight of the amphetamine contained in several different exhibits. The amphetamine solutions that were seized followed the execution of a search warrant that uncovered a laboratory used to manufacture amphetamines. The evidence revealed that the total gross weight of the seized solutions and substances was 3118 grams. It is not disputed that the vast majority of the aggravated quantity of amphetamine was contained within a five liter, round bottom, three neck flask. The total weight of the solution within this flask was 2845 grams. Both experts agreed that the solution within the flask was split into two distinct and observable layers; the larger and lower portion was described as an aqueous layer and the smaller portion floating on top of the aqueous layer was identified as an organic layer.

The State's expert witness, Glen Carl Harbison, testified that these two layers were "significantly different" and that they do not mix. The aqueous layer was described as "mostly water" which contained only a residual and insignificant amount of amphetamine. Harbison also testified that the aqueous layer was an adulterant, "since it is present together with the other substances." Harbison's definition of adulterant was "something which would take away from the purity of the compound." While Harbison conceded he did not know the separate weights of the two layers, he did admit that "most of it is water."

The appellant's expert witness, Max Courtney, also testified that the solution

contained two separate layers which do not mix. However, and contrary to Harbison's testimony, he did not believe the aqueous layer could be classified as an adulterant. Courtney estimated that the aqueous layer was 96% of the solution within the five liter flask. In addition, he testified that this layer contained no amphetamine. Moreover, Courtney concluded that if the aqueous layer was subtracted from the total weight of 3118 grams, then the weight of the amphetamine remaining would be less than 400 grams.[2]

In his testimony Harbison did not indicate at what point in the manufacturing process the solution had been seized. He further testified that although amphetamine may come in liquid form, it is clear that the solution was still in the manufacturing process rather than ready for distribution and sale as a final product. Significantly, neither witness offered "chemical definitions" for the terms adulterant and dilutant.

In determining the sufficiency of the evidence in this case one must initially determine the role "adulterants" and "dilutants" play in the statutory offense. More specifically, were the terms adulterant and dilutant as used in Article 4476–15, § 4.042(d)(2), meant to encompass the aqueous solution at issue? As noted by the court of appeals, this issue is a case of first impression in Texas. See also *Engelking v. State*, 727 S.W.2d 694 (Tex.App.—Houston [1st] 1987, pet. granted).

▮ Neither "dilutant" nor "adulterant" is defined within § 4.042 of the Texas Controlled Substances Act. A statute must be construed so as to effect the Legislature's intent. Consequently, this Court must attempt to determine the scope and meaning of the terms "adulterant" and "dilutant." Although the Code Construction Act (§ 311, et seq., Tex Gov't.Code) is by its

---

1. Tex.R.App.Pro. 200(c)(2) and (c)(4).

2. Courtney's estimate was based solely on an in-court, visual observation of the flask, rather than a pretrial laboratory analysis. The State's

expert witness, Harbison, did not provide any estimate or data as to the separate weight or mass of the two layers.

language inapplicable to interpreting the Controlled Substances Act, Art. 4476–15, et seq., V.A.C.S.,[3] we nonetheless may look to it for guidance when dealing with matters such as this. The words and phrases within a statute must be read in the context in which they are used. Section 311.011(a), Tex.Gov't.Code. Usually, the word or phrase must then be construed according to the rules of grammar and common usage. *Id.* This is not the case when the word or phrase has acquired a technical or particular meaning by legislative definition or otherwise. Section 311.011(b), Tex. Gov't.Code. If the word or phrase has acquired a technical or particular meaning, then the term must be read in context and according to the technical or particular meaning which it has acquired. *Id.*

The court of appeals held that "to dilute or adulterate a substance is to intentionally add a foreign substance in order to either prepare the original substance, or to lessen its strength or purity." *McGlothlin v. State, supra,* at 865. The court of appeals based this definition on the "obvious" intent of the Legislature to include these substances so that a criminal defendant could not avoid a "conviction simply because of the particular stage of production in which the drugs may be found at any given time by law enforcement officers." *Id.*

The appellant contended that such a definition would incorporate the weight of a bathtub full of water with that of amphetamine if a person threw amphetamines in the bathtub to avoid being caught. The court of appeals found the example to be distinguishable, as water was a function of the manufacturing process of the amphetamines in the appellant's case, while in the appellant's example it was not.

If appellant had been charged with manufacturing amphetamines perhaps the "bathtub" example could be so easily dismissed. Appellant, however, was charged with the aggravated possession of amphetamine. The Texas Controlled Substances Act includes violations for both the possession *and* manufacturing of various substances. See Art. 4476–15, § 4.01(b)(2) and § 4.03(d)(2). The extent of punishment for both possession and manufacturing convictions may be increased by the weight of adulterants and dilutants present in the solution.[4] Thus, under the expansive definition utilized by the court of appeals, if a quantity of amphetamines was stored in a bathtub full of water the weight of the water could be added to the total weight of the solution when charging one with possession. The specialized definition of "adulterant" and "dilutant" given by the court of appeals appears to be too broad.

The definition adopted by the court of appeals was derived from the common definitions of "adulterate" and "dilute."[5] Unfortunately, the terms "adulter-

---

3. Section 311.002, Tex.Gov't.Code, states:
     This chapter applies to:
        (1) each code enacted by the 60th or a subsequent legislature as part of the state's continuing statutory revision program;
        (2) each amendment, repeal, revision, and reenactment of a code or code provision by the 60th or a subsequent legislature;
        (3) each repeal of a statute by a code; and
        (4) each rule adopted under a code.
     The Controlled Substance Act (Art. 4476–15, et seq., V.A.C.S.) is not a code. See for example: *Knight v. International Harvestor Credit Corp.,* 627 S.W.2d 382 (Tex.1982); *Harris County v. Suburban Utility Co.,* 547 S.W.2d 72 (Tex.Civ. App.—Houston [1st] 1977).

4. Only Arkansas and New Jersey use the terms "adulterant" and "dilutant" in graduating punishment for increasing quantities of controlled substances. ARK.STAT.ANN., § 82–2617 (Supp. 1985). N.J.STAT.ANN., § 24:21–20 (West Supp. 1987) (provides for graduated punishment for quantities greater than one ounce but this must include *at least* 3.5 grams of the "pure free base").
     Several States use the term "adulterated" in graduated penalty schemes for those convicted of the *delivery* or intent to *deliver* controlled substances. See, e.g., IND.CODE § 35–48–4–1 (1987). Obviously, adulteration within the delivery or trafficking context differs from the possession and manufacturing situation before us.

5. Adulterate: (1a) "to corrupt, debase, or make impure by the addition of a foreign or a baser substance: prepare (as for sale) with one or more ingredients included that are not part of the alleged substance ..."

ant" and "dilutant" are not used in a common manner. Instead each is part of a complex statutory scheme designed to prohibit the manufacture and possession of a wide variety of controlled substances. This complexity is evidenced by the necessity of expert testimony to properly present and prove a criminal violation of the Act. Moreover, the inability of the experts to agree on proper definitions and application of the terms adulterant and dilutant is noteworthy. The terms "adulterant" and "dilutant" must therefore be read in the context of the entire Controlled Substances Act and construed according to the particular meaning for which each is intended.

The only definition of "adulterant" or "dilutant" found in the Texas Controlled Substances Act is the definition found under "drug paraphernalia" wherein a "diluent" [6] or "adulterant" is listed as drug paraphernalia and is defined as follows:

(15)(F) a diluent or adulterant, such as quinine hydrochloride, mannitol, mannite, dextrose, or lactose, used or intended for use in cutting a controlled substance;

The court of appeals did not consider the relevance or impact of the definition of "adulterant" and "diluent" as set forth in § 1.02(15)(F), *supra*, on the meaning to be given both words as used in setting out the aggravating offenses.

The State contends that the above definitions do not attempt to define either "diluent" or "adulterant" but merely sets out a few examples of drug paraphernalia. We disagree. Every substance following "diluent or adulterant" in the subsection shares one common characteristic: Each is typically used as a cutting agent. This list of substances constituting examples of cutting agents is by no means exhaustive. It is however, indicative of the meaning of "diluent" and "adulterant," as used in subsection (15)(F). Both a diluent and adulterant are similar in the sense that either can "cut" a controlled substance.

While examples provided in the definition of "diluent" and "adulterant" in subsection (15)(F) are a nonexclusive list of various drug related substances, the definition given these terms remains probative as to the Legislature's use of the terms elsewhere in the Act. As Judge Levy wrote in *Engelking v. State, supra:*

Before September 1, 1981, the Controlled Substances Act made no reference to adulterants, dilutants, or diluents. At that time, the definition of paraphernalia was added, with its reference to adulterants and diluents. Tex.H.B. 733, 67th Leg. (1981). Simultaneously, the provisions establishing aggravated offenses were enacted. These provisions refer to adulterants and dilutants. Tex.H.B. 730, 67th Leg. (1981). It is presumed that contemporaneous statutes [7] are actuated by the same policy and imbued with the same spirit, and that they should be read together and harmonized unless their provisions are absolutely repugnant. *Ex parte Harrell,* 542 S.W.2d 169,

---

(2) "to lessen the full intensity of ... through the addition of extraneous, incongruous, or discordant elements ..."
*Webster's Third New International Dictionary* (1976).
Dilute: (1) "to make inferior or reduce (as in power or effect) ...: make inferior (as in quantity or quality)."
(2a[1]) "to make thinner or more liquid by admixture (as with water) [2] to make less concentrated: diminish the strength, activity, or flavor of ..."
(2b) "to change by mixture with extraneous or foreign elements esp. with a resulting debasement." *Id.*

**6.** The word "diluent" as used in subsection (15)(F) is synonymous with the word "dilutant."

"Diluent" is defined as a "diluting agent." *Webster's Third New International Dictionary* (1976).

**7.** Both HB 730 and HB 733 were filed on February 2, 1981, as were several other bills all seeking to modify the Controlled Substances Act. These bills were reviewed over the next several months in both House and Senate public hearings. Unfortunately, a review of the tape recordings of these hearings does not reveal any helpful information regarding the terms "adulterant" and "dilutant." However, it is clear that both bills were part of a general overhaul of the Controlled Substances Act sponsored and motivated in part by the Texans War on Drugs Commission.

172 (Tex.Crim.App.1976). Accordingly, the use of the terms 'adulterants' and 'dilutants' in subchapter four of the Controlled Substances Act, the section here in controversy, refers to substances used or intended for use in cutting a controlled substance.

*Engelking v. State, supra,* at 700 (Levy, J., dissenting).

The classification of adulterants and dilutants within the Act as cutting agents is in harmony with the definitions given the terms in publications which specifically address the subject of drug abuse. For example, in one publication, "adulteration" is defined as "[d]ilution of a drug with either an inert material to add bulk or some more potent material to create a greater effect." E. Abel, *A Dictionary of Drug Abuse Terms and Terminology* 5 (1984). "Dilutant" is defined as an "[i]nert material used to increase the bulk of an active substance without affecting its activity." *Id.,* at 48. "Adulteration" has also been defined as "[t]he process by which a drug is made impure or inferior by the addition of an improper substance." R. O'Brien & S. Cohen, *The Encyclopedia of Drug Abuse* 9 (1984). Obviously, the addition of the water to the amphetamine at issue was not intended to make the drug impure or inferior. Rather, the water was used only with the intent of completing the manufacturing process. See *Engelking v. State, supra,* at 699 (Levy, J., dissenting).

These definitions, coupled with the definition set forth in § 1.02(15)(F), leave a clear indication that within the field of drugs and controlled substances, "adulterants" and "dilutants" are compounds, substances or solutions added to the controlled substance with the intent to increase the bulk of the product. Or, increase the quantity of the final product "without affecting its activity." Thus, while the addition of an adulterant or dilutant may affect the controlled substance in a different manner, each ultimately increases the bulk of the final product.[8] The addition of adulterants and dilutants to the weight of the controlled substances for purposes of determining punishment, emphasizes their function as a substance which increases the quantity of a drug rather than the quality.

If the Legislature had intended to include every substance within the weight classifications of the various manufacturing and possession offenses within the Act, they could have easily done so. Under the Federal scheme, an offender may be charged with possession of a controlled substance and this will include the total weight of a mixture or substance containing a *detectable* amount of a controlled substance. E.g., 21 U.S.C., § 841(b). Likewise, several other states also have statutory schemes which increase the range of punishment for those offenders in possession of controlled substances in greater quantities. As worded, these statutes would clearly cover the water at issue in the present case. For example, in Florida and Georgia an offender may be charged when "in actual or constructive possession of 28 grams or more of [a controlled substance] or of *any mixture* containing the [controlled substance]. FLA.STAT.ANN., § 893.01 (West Supp.1987); GA.CODE ANN., § 16–13–20 (Supp.1987). Other States have similar comprehensive drug laws.

In Texas, punishment for the manufacturing and possession of controlled substances is assessed according to the penalty group in which the controlled substance is found. There are four distinct penalty

---

**8.** The State argues that the legislative intent is clear, "to see that drug users, pushers and drug manufacturers do not get the benefit of being caught at a 'lucky' point in their manufacturing or cutting of the drug for sale or use ... [amphetamine] is always found with other substances—water and other chemicals used in manufacture or added later to facilitate use and sale of the basic drug." We fail to see how the definition which we have approved would allow an offender to get "lucky" and avoid conviction for an increased offense. If an agent adds to the bulk of the final product it is included in the total weight as an adulterant or dilutant. This includes agents added during manufacturing which will increase the bulk of the yet unfinished product.

groups. Penalty groups one and two include *only* the prohibited controlled substance. Penalty groups three and four, however, include not only the prohibited controlled substance, but also *"[a]ny* material, compound, mixture, or preparation which contains any quantity of the following substances ... [emphasis added]"* Article 4476–15, § 4.02(d), V.A.C.S. The differing penalty groups indicate that the Legislature is capable of drafting legislation which clearly includes "any material, compound, mixture or preparation." For some reason, the Legislature has chosen to limit the controlled substances in penalty groups one and two to the listed controlled substance only. Amphetamine, the possession of which the appellant was found guilty, is a penalty group two substance.

The Legislature obviously sought to broaden the offender's potential liability beyond the weight of the pure controlled substance. The desire to broaden the offender's liability was not limitless, however. By using the terms "adulterant" and "dilutant" rather than words or phrases such as "detectable amount" or "any mixture," the Legislature clearly intended to establish some constraints. The definition of "adulterant" and "dilutant" which we have set out comports with legislative intent.

It is clear from the record that without the addition of the water, the appellant was in possession of less than 400 grams. The record is devoid of any evidence pertaining to the reason or purpose for the presence of the water in the solution. Absent any such evidence it cannot be said that the water was an adulterant or dilutant. That is, the record contains no evidence that the water was intended to increase the bulk or quantity of the final product.

Based on the foregoing analysis, the judgments of the trial court and court of appeals are reversed and the cause is remanded to the trial court with instructions to enter a judgment of acquittal as to the offense of possession of amphetamine over 400 grams.

WHITE, J., concurs in the result.

ONION, P.J., dissents.