**Michael Lee ISAACS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 08–88–00206–CR.**

Court of Appeals of Texas,
El Paso.

April 26, 1989.

---

Michael A. Lamson, Houston, and Gerald R. Lopez, Odessa, for appellant.

Gary Garrison, Dist. Atty., Odessa, for appellee.

Before FULLER, WOODARD and KOEHLER, JJ.

## OPINION

KOEHLER, Justice.

This is an appeal from a jury conviction for possession of phenylacetone and methylamine in an amount equal to 400 grams or more. The court assessed punishment at imprisonment for thirty years and a fine of $25,000.00. We affirm.

Point of Error No. One asserts that the evidence was insufficient to establish the highest level of aggravated offense for possession of 400 grams or more of the alleged controlled substances. A multi-agency raiding party executed a search warrant at the residence of the Appellant and discovered a methamphetamine laboratory in actual production. In addition to laboratory equipment and raw ingredients, the officers found a quantity of phenylacetone actually being prepared prior to the final stages of methamphetamine production. This appeal focuses upon the contents of two flasks, State's Exhibits Nos. 41 and 43, containing phenylacetone, and one five-gallon can containing methylamine, State's Exhibit No. 38. D.P.S. Laboratory Supervisor Burgess Cooke provided the only expert chemist testimony as to the contents of these exhibits and the weights of the various ingredients. Exhibit No. 41 contained a total of 420 milliliters of liquid, divided into two layers, one water and one phenylacetone. The concentration of phenylacetone in the aggregate was .47 grams per milliliter. Thus, the exhibit contained by weight 197.4 grams of pure phenylacetone. Exhibit No. 43 contained a total of 450 milliliters of fluid in the same two-layer configuration, with an aggregate phenylacetone concentration of .3 grams per milliliter. Thus, this exhibit contained 135 grams of pure phenylacetone. The five-gallon can of methylamine was full according to Cooke. He chemically confirmed the presence of methylamine but did not attempt to determine a concentration level or percentage of purity.

Appellant contends that the other ingredients in the exhibits besides the phenylacetone and methylamine were not proven to be adulterants or dilutants under the Controlled Substances Act as interpreted by the Court of Criminal Appeals in *Sloan v. State*, 750 S.W.2d 788 (Tex.Crim.App.1988), *Engelking v. State*, 750 S.W.2d 213 (Tex.Crim.App.1988) and *McGlothlin v. State*, 749 S.W.2d 856 (Tex.Crim.App.1988). He then asserts that because no weight of pure methylamine was assayed, the only evidence before the jury was of 335 grams of phenylacetone (actually, following his reasoning 332.4 grams).

■ We disagree with Appellant's contention for three reasons. First, we find the definitions of adulterant and dilutant utilized in *McGlothlin, Sloan* and *Engelking* inapplicable to the offense charged in this case and the evidence developed at trial. In those cases, the defendants were charged with possession of an end-product controlled substance, amphetamine and methamphetamine. The non-controlled aqueous manufacturing residue in the seized flasks in those cases was reasonably excluded from the aggregate weight of the seized substances for purposes of determining the category of offense committed. Thus, the definition of adulterant or dilutant as a substance intended to increase the bulk or quantity of "the final product" was a logical construction of the statute. As stated by the Court in *McGlothlin:*

> Rather, the water was used only with the intent of completing the manufacturing process. 749 S.W.2d at 860.

That is true in the case before us, but here the Appellant was charged with possession of controlled ingredients to be used to manufacture a controlled final product. The evidence reflected possession during the manufacturing process itself. With regard to the alleged substances in this case, the statute itself proscribes possession of "phenylacetone and methylamine, if possessed together with intent to manufacture methamphetamine." Tex.Rev.Civ.Stat.Ann. art. 4476-15, sec. 4.02(b)(7) (Vernon Supp.1989). Under this provision, this indictment and this evidence, we find it appropriate to include those adulterants or dilutants which are chemically integral to the possessory manufacturing process involving the conversion of phenylacetone and methylamine to methamphetamine. Consequently, the entire weight of the contents of State's Exhibits Nos. 41 and 43 was available for jury consideration and clearly exceeded 400 grams by weight.

■ Alternatively, we find the evidence sufficient even utilizing the adulterant/dilutant definition established in the aforementioned cases. The evidence reflected

332.4 grams of pure phenylacetone in Exhibits Nos. 41 and 43. Thus, an additional 67.6 grams of weight had to be shown elsewhere. Cooke testified that Exhibit No. 38 was a *"full"* five gallon can of methylamine, the weight of this liquid alone exceeding 400 grams. Combined with the phenylacetone, the evidence therefore reflects in excess of 700 grams of controlled substance. In *McGlothlin, Sloan, Engelking,* and present Exhibits Nos. 41 and 43, the State's own evidence reflected the presence of adulterants and dilutants. That is not the case with the methylamine, and we see no legal basis for presuming the presence of such components. Consequently, the jury could consider the entire contents of Exhibit No. 38 in determining the aggregate weight of the prohibited substances.

Alternatively, Cooke testified that the five-gallon can was labelled forty percent methylamine. If we consider this as some evidence of dilution, we must also consider it as evidence of the degree of dilution. If the entire contents weighed in excess of 400 grams, as stated by Cooke, then surely forty percent of at least 400 grams exceeded the 67.6 grams deficit left by the quantification of the pure phenylacetone. Under any of the above analyses, the evidence was sufficient for the jury to conclude that Appellant possessed in excess of 400 grams of the alleged controlled substances. Point of Error No. One is overruled.

Point of Error No. Two asserts insufficient evidence of affirmative linkage between the controlled substance and this Appellant, this being a multiple access case. The two bedroom residence was leased by Appellant and one David Mitchem. Appellant and his common-law wife occupied the master bedroom at the end of the hall, which had its own bathroom. Halfway down the hall from the living room, there was a second bedroom on the left and a bathroom directly opposite on the right. A few items of clothing and personal papers of Mitchem were in this bedroom. The controlled substances and actual laboratory was in the bathroom across the hall. Paraphernalia associated with the drug manufacturing was found in the spare bedroom. Several flasks were found in the common kitchen area. Officers executing the search warrant detected the distinctive foul odor associated with methamphetamine laboratories as they approached the front door. Even the defense witnesses who were present in the residence acknowledged the odor, although disclaiming awareness of its significance. When the officers knocked and announced their identity, they heard someone running inside and a voice yelled, "Hey, it's the cops." Upon entering, they observed several individuals seated in the living room. Appellant and Mitchem, however, ran down the hallway toward the master bedroom. Officer Clark apprehended Mitchem in the hallway. Detective Frederick caught the Appellant in the master bedroom. A sawed-off shotgun was found on the floor next to the bed. The only two means of ingress and egress were the front door utilized by the search team and a patio door in the master bedroom.

During surveillance earlier that day, D.P.S. Investigator Longoria observed the Appellant and another individual drive to the home of Arthur Lee Powell, Sr. The vehicle backed up to a storage shed and the two subjects both loaded an assortment of boxes into the trunk. They then drove back to Appellant's residence and transferred the boxes into the dwelling. Longoria could not tell what was in the boxes but they were similar to containers found in the laboratory that night. This transfer was approximately fourteen to fifteen hours before the search, according to D.P.S. Investigator McCullough who also testified that at the time of the search, the first stage of the methamphetamine manufacturing process was nearing completion. That stage normally takes eighteen hours.

Arthur Lee Powell, Sr., testifying for the defense, stated that Appellant was not one of the two men who visited his storage shed that day. He did, however, identify the items taken from the shed as several of the exhibits seized from the laboratory (State's Exhibits Nos. 1, 5, 6, 17, 18, 19 and 20).

The jury is free to accept or reject the credibility of any or all of a witness's testimony. The jury had an ample basis to reject Powell's denial of the identity of Appellant as one of the persons transferring the boxes and was equally justified in concluding that Longoria accurately identified Appellant. Powell's further testimony identifying the contents of the boxes as paraphernalia connected with the methamphetamine manufacturing is then fatal to this point of error. The jury could also extract incriminating implications from Appellant's flight to the master bedroom with Mitchem when the officers announced themselves. The jury could reasonably deduce that the goal was either the shotgun on the floor for purposes of resistance or the patio door for purposes of flight. In any event, the evidence of affirmative linkage was sufficient to conclude both culpable knowledge and culpable physical participation as a party to the possession. Point of Error No. Two is overruled.

In Point of Error No. Three, Appellant contends that the court erred in refusing to grant a new trial due to discovery of new evidence and failure of the State to disclose exculpatory evidence. The defense offered an affidavit and live testimony from one Jerry Wells. Wells was present at the time of the search. He was found hiding behind the bed in the spare bedroom. At trial, both the State and the defense exposed Wells' reputation as a methamphetamine "cooker" and suggested to the jury that that was his role in the activities at Appellant's residence. Wells testified that it was he and Mitchem who visited Powell's storage shed and transferred laboratory glassware and cookers to Appellant's residence. According to Wells, however, that transfer did not account for the presence of the controlled substances or other paraphernalia at the residence. Wells did not describe the extent of his visits to or familiarity with the living arrangements at the residence, depicting his activity there only on the day of the search. He did not know if Appellant was aware of the presence of the chemicals and laboratory apparatus. As to whether Appellant ever exercised posses-

sion and control over the seized items, he responded, "I don't believe so."

To authorize a new trial upon the basis of newly discovered evidence or newly available evidence, the Appellant must establish: (1) that the material could not have been discovered or presented in open court with the exercise of due diligence, (2) that it was material and credible and would probably bring about a different result on another trial, and (3) that it was competent and not merely cumulative, corroborative or impeaching. *Honea v. State*, 585 S.W. 2d 681, 687 (Tex.Crim.App.1979). The Wells evidence failed to meet any of these prerequisites. It was merely cumulative and corroborative of the other defense evidence as to Appellant's participation in the transfer of the laboratory equipment. Furthermore, the new trial record discloses a want of diligence on trial counsel's part in securing this testimony for trial. Shortly after this offense, but prior to trial, Wells was indicted and entered a plea of guilty to manufacturing methamphetamine in Midland. He was placed on probation and was reporting to the probation officer at the time of trial and the new trial hearing.

The motion for new trial and appellate brief also assert that the State withheld exculpatory evidence with regard to fingerprints taken at the time of the search. No evidence, however, was presented at the new trial hearing as to the results of any fingerprint analysis (exculpatory, inculpatory or inconclusive). The prosecutor stated that no comparison was ever attempted. The defense concedes that latent print cards were provided to the defense in advance of trial. Apparently, no effort was made by the defense to have these independently compared to Appellant's prints. At trial, during the defense phase, counsel recalled Investigator Longoria and specifically elicited that fingerprints were taken by Officer Carter of the Odessa Police Department. No inquiry was made as to results, and the defense did not call Officer Carter.

The new trial evidence fails to reflect even the existence of exculpatory fingerprint evidence. Even if it did, a want of

diligence is shown by the record in this regard. Point of Error No. Three is overruled.

The judgment is hereby affirmed.