William John BLACKMON, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–89–00205–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Feb. 15, 1990.
Rehearing Denied March 1, 1990.

Michael A. Lamson, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Katherine Haden, Chuck Rosenthall, Asst. Dist. Attys., Houston, for appellee.

Before COHEN, WARREN and DUNN, JJ.

## OPINION

COHEN, Justice.

A jury found appellant guilty of possession with intent to manufacture methamphetamine weighing at least 200 grams and less than 400 grams, and assessed punishment at 15 years imprisonment and a $15,000 fine.

In four points of error, appellant contends: 1) the evidence is insufficient because it shows he possessed less than 200 grams of methamphetamine; 2) the evidence is insufficient to corroborate the accomplice testimony; 3) the indictment should have been quashed; and 4) fingerprints seized in an illegal arrest were wrongly admitted in evidence.

On October 3, 1988, Houston Police Officer Chance secured an arrest warrant for appellant and two others, combined with a search warrant for 9207 Carrick Street in Harris County. Upon executing the warrant that night, Chance found a methamphetamine lab in the residence, along with items common to such labs, including acetone, methylamine, methanol, ethyl ether, sodium acetate, acetic anhydride, phenylacetone, coffee filters, scales, beakers, single-neck flasks, plastic funnels, hoses with stoppers, a homemade heater system, a fan

motor, hoses connected to glassware, a vacuum pump, and a hot plate. A ventilation system had been installed to remove the odor from the production of methamphetamine. Officers found several containers of methamphetamine, and in appellant's bedroom, they found $1600 cash, 93 grams of 77.1% methamphetamine in a boot, and papers bearing appellant's name.

Appellant had lived there rent-free for approximately 10 months. John Friedel, a co-defendant, testified that appellant operated the laboratory, and he (Friedel) sold the methamphetamine that appellant produced. Friedel testified that he added sugar to the methamphetamine in order to increase its bulk and kept the finished product in a peanut butter jar in the lab.

Appellant was away during the October 3 search. When police returned on October 7, he was carrying clothes and personal items out of the residence. Officers arrested him pursuant to the warrant dated October 3, 1988.

Appellant first asserts the trial court should have quashed the indictment because it gave inadequate notice of the charges against him. The indictment alleged that appellant, on or about October 3, 1988, did

intentionally and knowingly possess with intent to manufacture a controlled substance, namely, methamphetamine, weighing by aggregate weight, including any adulterants and dilutants 200 grams or more but less than 400 grams.

Appellant particularly complained that the indictment did not allege what substance he possessed with intent to manufacture methamphetamine. On appeal, he argues that he could have been charged with possessing phenylacetone together with methylamine with intent to manufacture methamphetamine, *see* TEX.REV.CIV. STAT.ANN. art. 4476–15, § 4.02(b)(7) (Vernon Supp.1989), because both of these substances were also seized at his residence.

We first note that the indictment tracks the language of the relevant statute, which provides:

(a) Except as authorized by this Act, a person commits an offense if he knowingly or intentionally manufactures, delivers, or possesses with intent to manufacture or deliver a controlled substance listed in Penalty Group 1.

(c) A person commits an aggravated offense if the person commits an offense under subsection (a) of this section and the amount of the controlled substance manufactured, delivered, or possessed with intent to manufacture or deliver is, by aggregate weight, including any adulterants or dilutants, 28 grams or more.

TEX.REV.CIV.STAT.ANN. art. 4476-15 § 4.03(a), (c) (Vernon Supp.1989).

■ An indictment that tracks the statute is generally sufficient. *Lewis v. State*, 659 S.W.2d 429, 431 (Tex.Crim.App.1983). The question is whether that general rule should apply here. In order to prevail, appellant must show a notice defect that hindered his ability to prepare a defense. *Adams v. State*, 707 S.W.2d 900 (Tex.Crim. App.1986). Appellant did not allege such harm in his motion to quash, but asserted only a general lack of notice. He did not assert in the trial court, as he does now, a possible need to defend against charges of possessing phenylacetone together with methylamine. Any such concern would have been groundless because those substances were not alleged; only methamphetamine was.

The only crime possibly alleged in this indictment is possession of methamphetamine with intent to manufacture methamphetamine. We note that the statute does not require that the substance possessed be different from, or an ingredient of, the substance intended to be manufactured. We agree that the indictment would have been clearer if the word "methamphetamine" had followed "possess," and the State would be well advised to amend its indictments to give such notice. Nevertheless, under this record, we find no defect of notice and no harm.

Point of error one is overruled.

■ In point two, appellant contends the court erred in denying his supplemental motion to suppress any fingerprint exemp-lars seized as a result of the arrest on October 7. The fingerprints taken from appellant after his arrest matched those on a can of toluol found in the house. Thus, they linked appellant to the house and to the lab inside it.

Appellant argues that the combined search and arrest warrant did not comply with TEX.CODE CRIM.P.ANN. art. 15.02 (Vernon 1977), because it did not state he was accused of an offense. Appellant did not make this complaint in the trial court. Therefore, nothing is presented for review. However, we note that the affidavit attached to and mentioned in the warrant accuses appellant of possessing methamphetamine.

■ Appellant further argues the arrest was illegal because he was not arrested within the time limit stated in the search and arrest warrant. He contends the arrest warrant expired by its own terms before he was arrested. The magistrate required the warrant to be executed and returned "within three days, exclusive of the day of its execution." The magistrate issued the warrant at 11:05 p.m. on October 3, 1988. Police arrested appellant on October 7, 1988.

Under TEX.CODE CRIM.P.ANN. art. 18.07 (Vernon 1977), the time allowed for the execution of a *search* warrant shall be "three whole days, exclusive of the day of its issuance and of the day of its execution," but under TEX.CODE CRIM.PROC.ANN. art. 18.06 (Vernon 1977), a *search* warrant "shall be executed within a shorter period if so directed in the warrant by the magistrate." Here, the magistrate shortened the time for execution of both the search and the arrest warrant by omitting the statutory language "exclusive of the date of issuance." Moreover, Texas law puts no time limit on an *arrest* warrant. Chapter 18 time limitations apply only to search warrants. Nevertheless, the magistrate put his own time limit on this arrest warrant, and it was shorter than what the law provides for search warrants. The State cites no law that prohibits a magistrate from limiting the duration of his arrest

warrants. Therefore, we must confront the point of error on the merits.

We overrule the point for many reasons. First, the execution of the October 3 warrant on October 7 was within the time approved by this Court (over the author's dissent) in *Gonzalez v. State*, 768 S.W.2d 436 (Tex.App.—Houston [1st Dist.] 1989, no pet.). Second, TEX.CODE CRIM.P.ANN. art. 38.23(b) (Vernon Supp.1990), provides a good faith exception to the Texas statutory exclusionary rule for evidence obtained by officers acting in good faith reliance on a warrant issued by a neutral magistrate based on probable cause. In the trial court, appellant did not challenge the officer's good faith, the magistrate's neutrality, or the arrest warrant's probable cause, and the State did not assert the good faith exception. However, the arresting officer (who had not read the warrant, but had participated in executing it on October 3 and correctly assumed he was acting under the same warrant) testified the warrant had not expired on October 7, despite the statutory time limit. His belief was no doubt based on the ambiguous language of articles 18.06 and 18.07, which caused this Court to disagree in *Gonzalez*. Thus, articles 18.06 and 18.07 provide a basis for the officer to believe, in good faith, that the arrest warrant was still good. Third, the only fruits of the October 7 arrest were fingerprints taken from appellant's hands. The police later obtained his fingerprints from Florida authorities, who had them before this arrest. We note that the arresting officers already knew appellant's identity and description, both of which were stated in the warrant, and they already had the toluol bottle bearing appellant's fingerprints. Appellant's involvement in this crime was not discovered as a result of the seizure of his fingerprint. *Compare Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (dragnet arrest of young black males to see whose fingerprint matched that left in home of rape victim.). The State may, therefore, avail itself of the inevitable discovery rule because the same evidence would have been produced from an untaint-ed source. *Bell v. State*, 724 S.W.2d 780, 793 (Tex.Crim.App.1986).

Finally, the arrest was justified without a warrant, under TEX.CODE CRIM.PROC.ANN. art. 14.04 (Vernon 1977), which provides:

Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused.

Officer Ashwood, who helped execute the arrest and search warrant on October 3, testified he talked on October 7 to Sergeant Crocker, who said appellant was in the residence, but was preparing to leave. When Ashwood arrived, he saw appellant taking property from the house, as if moving. Ashwood testified it would have taken him approximately three hours to obtain another arrest warrant. He stated that he was the only officer on the methamphetamine squad on duty that day, and no other officer could have watched appellant while the warrant was obtained.

We hold that the magistrate's statement in the warrant, that appellant had committed a felony, and Sergeant Crocker's statement, that appellant was about to leave, along with Officer Ashwood's observations, met the requirements of art. 14.04 for a warrantless arrest. Point of error two is overruled.

■ In point of error three, appellant contends the evidence was insufficient because the State proved that he possessed less than 150 grams of methamphetamine, not 200 grams, as alleged. In determining sufficiency, we view the evidence in a light most favorable to the verdict to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App. 1988). Appellant was accused of possessing methamphetamine, including adulterants and dilutants, weighing at least 200 grams and less than 400 grams. Adulterants and dilutants are substances added to a controlled substance in order to increase

its bulk. *McGlothlin v. State*, 749 S.W.2d 856, 860 (Tex.Crim.App.1988).

Appellant asserts the State proved less than 150 grams of pure methamphetamine and did not prove the presence or weight of any adulterants or dilutants. The State's chemist testified he did not analyze for adulterants and dilutants and did not know if the methamphetamine was being packaged for use, or if the makers intended to further purify it.

The State presented the following exhibits:

| | |
|---|---|
| EXHIBIT 37: 93.0 grams of powder containing 77.10% methamphetamine = (bag with powder) | 71.703 grams methamphetamine |
| EXHIBIT 38: 146.5 grams of powder containing 53.0% methamphetamine = (glass jar with powder in zip-lock bag) | 77.645 grams methamphetamine |
| EXHIBIT 39: .0328 grams of liquid containing 100% methamphetamine = (glass jar with another glass jar inside of it, inside a plastic bag) | .0328 grams methamphetamine |
| EXHIBIT 40: .384 grams of methamphetamine = (glass container with methamphetamine residue in bottom) | .384 grams methamphetamine |
| EXHIBIT 43: 252 grams of liquid, unknown quantity methamphetamine = (glass jar with unknown brown liquid) | –0– |
| EXHIBIT 49: .116 grams of powder containing 94.8% methamphetamine = (glass jar with zip-lock baggie inside, with white powder residue in it) | <u>.1099 grams methamphetamine</u> |
| TOTAL ............................ | 149.8747 GRAMS |

---

The State conceded at oral argument that it proved no weight of methamphetamine in exhibit 43. Thus, only exhibits 37 and 38 are important because they are the only ones whose combined weight could equal the 200 grams alleged.

Appellant contends that because the chemist did not test for adulterants and dilutants, only the weight of pure methamphetamine can be used to prove the required weight, 200 grams. He relies on *Sloan v. State*, 750 S.W.2d 788, 789 (Tex.Crim.App.1988), and *Engelking v. State*, 750 S.W.2d 213, 216 (Tex.Crim.App.1988), where the State failed to prove the weight of adulterants and dilutants added to controlled substances. *See also Conner v. State*, 757 S.W.2d 806 (Tex.App.—Tyler 1988, no pet.)

In *McGlothlin*, the court referred to "the necessity of expert testimony to properly present and prove a criminal violation of the (controlled substances) act." 749 S.W.2d at 859. Here, as in *McGlothlin, Sloan,* and *Engelking,* we have expert testimony concerning the weight of the pure methamphetamine, but we have no expert testimony regarding the weight of adulterants and dilutants. This case differs from those three cases, however, because there is non-expert testimony concerning adulterants and dilutants. John Friedel, a co-defendant, testified he had cut methamphetamine in the house at 9207 Carrick by adding granulated sugar to increase its bulk, and that he kept the methamphetamine he was going to sell in a peanut butter jar in the lab. He testified as follows:

Q: Do you understand or have you ever heard the term of "cutting" narcotics?

A: Yes, sir.

Q: What does "cutting" mean?

A: It's adding something to it to produce more.

Q: Did you ever cut any methamphetamine in that house?

A: Yes, sir.

Q: What did you use to cut it with?

A: Granulated sugar.

Q: Did you know how to do that on your own or did someone have to teach you?

A: I was told.

Q: Who told you how to do it?

A: I knew how to add it to it, but John [appellant] told me what to use.

Q: And would you tell the jury what process you used to cut your methamphetamine?

A: Well, with granulated sugar you get a piece of tin foil, and lay the sugar in it and lay the tin foil over it and use a rolling pin to break it down where it wasn't granulated anymore.

Q What did you do with the granulated sugar?

A: I would add it to the methamphetamine.

Q: Is that to increase the bulk of the methamphetamine?

A: Yes, sir.

Q: Did you keep methamphetamine that you were going to sell at any particular location in that house?

A: Yes, sir.

Q: Where did you keep it?

A: I kept it in a peanut butter jar. It was inside the lab underneath the table in the middle of the room, underneath the scales.

Q: Let me show you what has been admitted in evidence as State's Exhibit 7. Do you see the peanut butter jar in that picture?

A: Yes, sir.

Q: Would you take this pen and draw a circle around it, please, sir?

State's exhibit 7 is a photograph of a glass jar next to a scale and other materials, all on a table. The writing on the lid of the jar states "Kroger Natural Peanut Butter." Inside the jar, there is a light colored, solid object that could be a rolled up zip-lock baggie. The State's chemist later testified that State's exhibit 38 was "a jar that contained a zip-lock bag inside, which contained white powder in the zip-lock bag," and the powder weighed 146.5 grams, of which 53% was methamphetamine. Although the court reporter's index of exhibits describes State's exhibit 38 as a "peanut butter jar W-meth powder," no witness identified State's exhibit 38 as a peanut butter jar, or as the jar circled by John Friedel in the photograph, State's exhibit 7. The chemist identified it only as "a jar." The court reporter's index of exhibits, which is not evidence, lists three other peanut butter jars that were admitted in evidence, State's exhibits 41, 49, and 50, but exhibits 41 and 50 did not contain methamphetamine, and exhibit 49 contained only a small amount. Thus, in order to prove 200 grams, as alleged, the State had to prove that exhibit 38 was the peanut butter jar circled by Friedel in exhibit 7.

The State asked its chemist to look at five photographs labeled exhibit numbers 3, 7, 9, 13, and 15, and to state whether he recognized in those photographs the physical exhibits then before him. The exhibits then before him included *two* peanut butter jars, State's exhibits 38 and 49. Exhibit 49, like exhibit 38, contained a zip lock bag inside, but the chemist testified it contained "white powder residue," whereas 38 contained "white powder."

We have examined the State's photographic exhibits 3, 7, 9, 13, and 15. Exhibits 7 and 15 show two different peanut butter jars, both apparently containing a solid white substance. The jar shown in exhibit 15 is apparently a different brand and is at a different location than the one shown in exhibit 7. We have attempted to call up the original exhibits numbered 38 and 49, but have been told they were destroyed.

The two questions before us are: 1) whether John Friedel's testimony, quoted above, can be interpreted to mean that the particular methamphetamine he kept for sale in "a peanut butter jar" had been cut with granulated sugar; and 2) if so, is the jar pictured and identified by Friedel in

State's exhibit 7 the same jar admitted in evidence as State's exhibit 38, or is it the other peanut butter jar admitted in evidence as State's exhibit 49. The difference is important because the powder in State's exhibit 38, if it contains granulated sugar as a dilutant and adulterant, is heavy enough, when added to exhibit 37, to meet the State's burden of proof, but the powder residue contained in State's exhibit 49 is not.

We again note that the chemist did not test for adulterants, no witness identified State's exhibit 38 as the same jar pictured in State's exhibit 7, or even as a peanut butter jar, and exhibit 38 is not available for our inspection. Only the court reporter's list of exhibits identifies exhibits 38 and 49 as peanut butter jars.

We conclude, when viewing the evidence in the light most favorable to the verdict, that John Friedel's testimony could have been interpreted by a reasonable jury to mean that the particular methamphetamine he kept in a peanut butter jar inside the lab, underneath the scales, had been cut with granulated sugar to increase its bulk. We further conclude, although not without difficulty, that a reasonable jury could have found that the jar circled by Friedel in State's exhibit 7, located next to scales on a table, is the same peanut butter jar later admitted in evidence as exhibit 38. Exhibit 38 was before the jury, which may have found it identical to the jar pictured in exhibit 7. It is not before us for review, and nothing indicates it was not identical.[1] Thus, the jury could have found, based on Friedel's testimony, that the substance in exhibit 38, other than methamphetamine, was granulated sugar added by him as an adulterant to increase bulk, and that 146.5 grams of methamphetamine and adulterants in exhibit 38 plus the 71.7 grams of pure methamphetamine in exhibit 37

proved possession of at least 200 grams, as alleged. We hold the State met its burden of proof with the combination of the chemist's expert testimony and Friedel's non-expert testimony.

Point of error three is overruled.

In point of error four, appellant argues that insufficient evidence was presented to corroborate the accomplice testimony.

■ A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense. TEX.CODE CRIM.PROC.ANN. art. 38.14 (Vernon 1979). The sufficiency of the corroboration is tested by eliminating the accomplice's testimony and then examining the remainder of the evidence to see if it tends to connect the accused with the offense. *Reed v. State*, 744 S.W.2d 112, 125 (Tex.Crim.App.1988). All facts and circumstances in evidence may be looked to as furnishing the corroboration necessary, and the corroborative evidence does not have to directly link the appellant to the offense or be sufficient by itself to establish guilt. *Id.* at 126. "Insignificant circumstances sometimes afford most satisfactory evidence of guilt and corroboration of accomplice witness testimony." *Id.*

■ The accomplice testimony was from John Friedel and Dorcas Douglas Friedel, the two other individuals residing at the residence where appellant was arrested. They testified that appellant operated the laboratory in their home. John Friedel testified that appellant had lived there for 10 months before his arrest, and had occupied the bedroom where his personal papers

---

1. Appellant designated for inclusion in the appellate record "any and all evidence and arguments presented at the trial on the merits...." He did not mention the inclusion or preservation of physical evidence. He has not complained that the statement of facts is incomplete because the physical exhibits are missing, nor has he argued, in his brief or in oral argument, that exhibit 38 was not the jar pictured in exhibit 7, or that exhibit 49 was the jar pictured in exhibit 7. His argument is that expert testimony is required to prove the presence and weight of adulterants and dilutants, and there was none. He has not asked us to examine exhibits 38, 49, or any other physical exhibit not before us. Thus, appellant has not been harmed by the destruction of the exhibits, even assuming his designation was broad enough to include them.

were found, along with the $1600 in cash and 71.7 grams of methamphetamine found in a boot. John Friedel testified that the 18-wheeler truck and the Porsche automobile in front of the residence on October 3, 1988 were appellant's.

Eliminating this testimony, we now turn to the remaining evidence. When Officer Chance searched the residence, he found documents in a bedroom, including a trip lease signed by John Blackmon, dated June 10, 1988; a trailer inspection report and use agreement signed by John Blackmon; a truck and trailer repair ticket bearing appellant's name, dated April 19, 1988; an envelope addressed to John Blackmon at Route 1, Box 382C, Cleveland, Texas; a Uniform Identification Cab Card; and a buyer's tag for a 1977 International Harvester bearing appellant's name and showing the date sold as March 23, 1988. In the same bedroom, officers found $1600 in cash, and methamphetamine in a boot.

Officers found a can of toluol bearing appellant's fingerprints located in the lab, among the chemicals, the manufacturing equipment, and the methamphetamine. Witnesses testified that toluene, a common name for toluol, could be used to produce phenylacetone, a major ingredient of methamphetamine. On October 7, 1988, four days after the raid, appellant was at the residence with John Friedel and was loading property on a truck.

In determining the sufficiency of the corroboration, the evidence is viewed in a light most favorable to the verdict. *See, e.g., Martinez v. State*, 749 S.W.2d 556, 558 (Tex.App.—San Antonio 1988, no pet.). We hold that the evidence connects appellant with the offense charged and therefore satisfies article 38.14.

Point of error four is overruled.

The judgment is affirmed.