**Weldon Arvon HULTGREN, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2-92-117-CR.**

Court of Appeals of Texas, Fort Worth.

July 20, 1993.

Discretionary Review Refused Oct. 20, 1993.

William H. "Bill" Ray, Fort Worth, for appellant.

Tim Curry, Crim. Dist. Atty., Anne E. Swenson, Asst., Fort Worth, for State.

Before HILL, C.J., and HICKS and FARRAR, JJ.

## OPINION

HILL, Chief Justice.

Weldon Arvon Hultgren appeals his conviction by a jury of the offense of aggravated possession of a controlled substance, amphetamine, with intent to deliver. After Hultgren pleaded true to the enhancement and habitual counts in the indictment, the jury assessed his punishment at seventy-five years in the Texas Department of Criminal Justice, Institutional Division.

Hultgren asserts in two points of error that the evidence is insufficient to support his conviction because the State failed to prove an aggravated amount of amphetamine and because the evidence was insufficient to rebut his defense of entrapment.

We affirm because we hold that the evidence is sufficient to prove an aggravated amount of amphetamine and to rebut Hultgren's defense of entrapment.

Hultgren contends in point of error number one that the evidence is insufficient because the State failed to prove an aggravated amount of amphetamine beyond a reasonable doubt.

■ We must determine whether, viewing the evidence in the light most favorable to the jury's verdict, any rational jury could have found this essential element of the offense beyond a reasonable doubt. *Bonham v. State,* 680 S.W.2d 815, 819 (Tex. Crim.App.1984), *cert. denied,* 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985).

■ The applicable portion of the indictment alleged that Hultgren intentionally and knowingly possessed amphetamine of more than twenty-eight grams but less than four hundred grams, including any adulterants and dilutants.

Hultgren stipulated with the State through his counsel that the amphetamine he possessed was more than twenty-eight grams but less than four hundred grams, including any adulterants and dilutants. Hultgren and the State further stipulated that the substance weighed 30.6 grams and was seventy-three percent pure.

We hold that a rational jury could determine from this stipulation that the amphetamine Hultgren possessed was of more than twenty-eight grams but less than four hundred grams, including adulterants and dilutants.

Hultgren contends that the State was required to prove that any adulterants or dilutants have not affected the chemical activity of the amphetamine and that they were added to the amphetamine to increase its bulk or quantity, and that there is no such evidence. He relies on the cases of *Cawthon v. State,* 849 S.W.2d 346 (Tex. Crim.App.1992); *Reeves v. State,* 806 S.W.2d 540 (Tex.Crim.App.1990) (opinion on reh'g), *cert. denied,* —— U.S. ——, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991); and *McGlothlin v. State,* 749 S.W.2d 856 (Tex. Crim.App.1988).

In these three cases cited by Hultgren, the Texas Court of Criminal Appeals held that the evidence was insufficient because it failed to show, with respect to a mixture that was part controlled substance and part another substance, that the other substance had been added to the controlled substance with the intent to increase the bulk or quantity of the final product without affecting its chemical activity. *Cawthon,* 849 S.W.2d at 349; *Reeves,* 806

S.W.2d at 542, 544; *McGlothlin,* 749 S.W.2d at 860. In examining those three opinions, one can determine that the reason why that proof was necessary was to show that the other substance was an adulterant or dilutant so as to be able to count its weight toward the amount charged, because in each instance the amount of the controlled substance taken by itself was of a lesser weight than that alleged.

In the case at bar no such evidence is necessary because the stipulated evidence in this case shows that the total weight of the controlled substance, including dilutants and adulterants, is more than twenty-eight grams and less than four hundred grams.

We know from *McGlothlin,* 749 S.W.2d at 860, that, within the field of drugs and controlled substances, "adulterants" and "dilutants" are compounds, substances or solutions added with the intent to increase the bulk of the product or increase the quantity of the final product "without affecting its activity." When Hultgren stipulated that the combined material, including adulterants and dilutants, was of the alleged weight, his stipulation included those elements that are a part of the definition of "adulterant" and "dilutant."

Consequently, we hold that the evidence is sufficient to show the fact to which the parties stipulated. Because the parties made the stipulation that the combined weight of the amphetamine and any adulterants and dilutants was of sufficient weight to support guilt, a stipulation that by definition included the facts Hultgren contends were unproven, the fact that there was also a stipulation that the amphetamine by itself was not of sufficient weight is of no consequence. We overrule point of error number one.

■ Hultgren urges in point of error number two that the evidence was insufficient to rebut his defense of entrapment. The Texas Court of Criminal Appeals has held that section 8.06 of the Texas Penal Code adopts the "objective" test for entrapment, so that once the court determines that there was an inducement, the only consideration is of the nature of the police activity involved, without reference to the predisposition of the particular defendant. *Johnson v. State,* 650 S.W.2d 784, 788 (Tex. Crim.App.1983).

■ Burleson Police Officer James Lopez went with his supervisor to a Home Depot to buy a pair of gloves. They had been moving a barrel of phenylacidic acid, a precursor chemical used in the manufacturing of amphetamine or methamphetamine. The odor of the chemical was still on them when they went to the store.

While they were at Home Depot, Hultgren walked up to them and asked them if they were the ones reeking so bad. When neither officer replied, Hultgren said that that had been a really dumb question.

In the meantime, Lopez's supervisor recognized Hultgren and advised Lopez who he was. Lopez testified that they tried to avoid Hultgren. The officers subsequently decided to try to make a case on him.

After his supervisor had left the store, Lopez approached Hultgren and asked him if he were "interested." After smelling Lopez, Hultgren concluded that Lopez was about a day from finishing. Lopez confirmed that he was and again asked Hultgren if he were interested. He replied that he would be interested in one or two ounces at the start to make sure that the stuff was pretty good, and, if it were, that he could probably move as much as Lopez had. Hultgren asked for Lopez's address and phone number, but Lopez would not give it to him.

Hultgren asked Lopez to call him, and Lopez replied that he would. Hultgren repeated the request that Lopez call him about four or five times.

Sometime later, Lopez called Hultgren's home. Hultgren was not there, but the person who answered said that if he would call again in five minutes she would have him there.

Lopez talked to Hultgren in five minutes. Hultgren tried to set up a deal to buy an ounce of amphetamine for $1250. After some discussion of Hultgren paying partly in cash and partly with a fully automatic

machine gun and a drying agent with which to dry out the amphetamine, Hultgren agreed to buy an ounce of the amphetamine for $1250. They agreed on a location.

Lopez waited at the location with other officers. When Hultgren arrived, he motioned for Lopez to come to his car. Lopez refused. Finally, Hultgren got out of his car and approached Lopez. Hultgren told Lopez that he did not have the money because he was afraid of the location since one of his friends had been busted on the parking lot of the Wal–Mart across the street. He said that if the stuff was good he would go get the money at his mother's house. He examined the amphetamine and asked if it was an ether base. Lopez told him that it was. When Hultgren opened the bag of amphetamine and began to smell it, Lopez grabbed it back and put it in his pocket. Because he was trying to act like a drug dealer, Lopez began to get very gruff and acted upset.

When Hultgren tried to make other arrangements, such as his taking a sample to the proposed buyer or such as Lopez going to the buyer's apartment, Lopez refused, because it was dangerous and inconsistent with what a dope seller would do.

Lopez then left. He called Hultgren again about a week later. Lopez tried to set up another deal so Hultgren could buy the amphetamine from him. Hultgren asked him to call him back in a few minutes while he found out whether he could get the money. When Lopez called back, Hultgren said he could not get the money, but that he had a lot of things, such as certain vehicles, he could trade or give as security if Lopez would give him the amphetamine. Hultgren told him he could sell the ounce within a week with no problem. They agreed that a 1976 Chevy pickup would be the security for Lopez giving him the amphetamine to sell to others. He agreed to meet Lopez.

Hultgren drove up to the meeting face to face with Officer Lopez's truck. They met at the back of Lopez's vehicle on the driver's side. Lopez had a police investigator with him at the meeting. Hultgren told Lopez that he had the title of the truck. The investigator with Lopez checked the VIN number on the truck to make sure it was good.

Hultgren asked Lopez if he had the amphetamine. When Lopez got the amphetamine and handed it to Hultgren, he signaled for Hultgren's arrest. When Hultgren saw it was the police, he turned like he was going to run, but he was successfully arrested.

Officer Lopez testified that his position was that if Hultgren wanted to do the deal, he wanted to do the deal. He said that he did not coerce, beg, or plead for Hultgren to come out there. He said that Hultgren made him think that he wanted to buy.

Hultgren testified, saying that he smelled the men at the Home Depot, and that he had no desire to buy any amphetamines or methamphetamines from them. He said Lopez asked him if he would be interested in purchasing any of the stuff when he got finished. Hultgren said he told him that he did not mess around with that stuff anymore, but that if he wanted to Officer Lopez could call him. Hultgren later said that when Officer Lopez called him that he had no idea that he was going to call. He indicated that Lopez said he was wondering if Hultgren was still interested in buying some dope. He said that Officer Lopez offered him the chance and promised him that it could get better and would make him a bunch of money. He said that he had been staying away from people that dealt in narcotics. He acknowledged that he had told the officer that he could get a drying agent for narcotics.

Officer Lopez's supervisor testified that he told Lopez at the Home Depot about Hultgren and expressed his opinion that Hultgren was someone who, in all likelihood, would be likely to buy or sell amphetamines.

We hold that a reasonable jury could have found, beyond a reasonable doubt, that Lopez's activity was not such activity as would have induced Hultgren to engage in illegal conduct, as opposed to merely affording him an opportunity to commit the

offense. We overrule point of error number two.

The judgment is affirmed.